Good morning, Your Honors, and may it please the Court. Stephen Hammer on behalf of Defendant Appellant Mr. Michael Carey. I'd like to reserve three minutes for rebuttal, please. Your Honors, the key question in this case is whether the government's presumptively unlawful wiretap of Mr. Carey and his associates could be salvaged by the plain hearing exception. The answer is no. The government fell far short of carrying its burden to prove that the plain hearing exception applied. How do we review the District Court's determination that the plain hearing exception applied? Thank you for that question, Your Honor. You're welcome. We agree that the District Court's findings of underlying historical facts should be reviewed for clear error. But what a reasonable officer should have known based on those historical facts is not itself a factual finding. It's a mixed question of law and fact. Well, here's my difficulty. The previous panel remanded and said, there's a factual issue here. We want you to resolve it, District Court. And the District Court listened to the investigators, particularly Melser and Kroll, found them credible, found that under the circumstances they didn't actually know there was another investigation going on, and they found under the circumstances that a reasonable officer in their position wouldn't. The first finding is obviously one that we review with great deference, that they didn't know, correct? We agree, yes, Your Honor. So you say we review the second one de novo? I think that makes the most sense, Your Honor, and this is why it would be more consistent with the way this Court has reviewed the plain view exception as well as related doctrines like probable cause and reasonable suspicion. But doesn't the second one depend, doesn't it turn on particular, as you say, historical facts? In other words, one issue was whether or not Madrid's information was ever entered into the system. There didn't seem to be any evidence that it was. There was some evidence that information is typically entered into it, but Kroll couldn't say whether or not Madrid's information was entered into it. So there's a lot of historical facts that underlie what a reasonable officer would have known under the circumstances, and so I'm having some difficulty thinking we review those de novo. Your Honor, we accept all those historical factual findings. Those can be reviewed for clear error. We're not disputing any of the historical factual findings, but the conclusions based on that we think get de novo. It's just like a probable cause determination, the historical facts by the District Court. Take those as granted and then look at what an objectively reasonable officer would know based on those. And we direct the court to United States v. Disla at 805 F. 2nd, 1340. That's a plain view case in which this court reviewed de novo whether officers reasonably concluded that items described by a warrant might be found in certain containers. But in any event, Your Honor, even if it were clear error here, we believe we're entitled to relief because the District Court's conclusion is implausible in light of the record as a whole. And we would look to four key warning signs, timing, content, context and surveillance, that when put together should have indicated to a reasonable officer that the speakers on T-14 were unconnected with the Escamilla conspiracy. When, in your view, should a reasonable officer have known that the speakers on T-14 were not associated with the Escamilla conspiracy? We would say no later than the evening of March 15th, Your Honor, because it's the evening of March 15th with that surveillance information that's obtained on the 15th, which would allow officers to conclusively determine that the speakers on T-14 were unrelated to the Escamilla conspiracy. Tell me what about what they observed would lead them to that conclusion. Yes, Your Honor. So two pieces of information on the Adrian Madrid, and that would have been a simple matter based on the physical surveillance of Adrian Madrid that Agent Melzer's team conducted on the 15th. So they had a tracker on Madrid's vehicle, they knew the time that he crossed the border, they identified his vehicle and license plate. With that information and the access to the Treasury database, which Agent Melzer testified he had access to, it would have been a simple matter to determine Adrian Madrid's identity. Was there any evidence, that's why I asked you another question before, I thought the testimony was that it wasn't clear whether or not Madrid's information was in the Treasury database. Your Honor, the testimony of Agent Melzer on the record was that he did identify Adrian Madrid before Madrid was arrested on March 17th. That's at the second volume of the excerpts of record, page 293. And so I think the reasonable inference there is that he certainly could have used the information he obtained and it would have been a simple matter to query the Treasury database with the crossing time and the license plate information that they obtained on Madrid. I don't want to monopolize this, but I'm interested in this factual background. So let's assume that he identified the driver of this car, because he had a geolocation device on the phone, as Adrian Madrid. Why would that have told him that there was a separate conspiracy? Part of the reason that the wiretap was on was to find out who was in the Escambia conspiracy. Yes, Your Honor. So this is the other critical piece of information that agents should have obtained on the 15th. With Madrid's identity, it would have been a simple matter to get connected to the government's separate investigation into Mr. Carey and his associates. And that would have provided the critical information that there was no overlap between the conspiracies. So the way that that could have happened is, with Madrid's identity, Agent Melzer could have queried the de-confliction database, entered Madrid's information, and it would have sent an alert to Agent Kral, who was leading the investigation into Mr. Carey and his associates. The two of them could have gotten together, compared their notes, and determined what they ultimately concluded after Madrid was arrested on the 17th, which is that there were no overlaps between their respective investigations. And for you to prevail, we'd have to conclude that they should have discovered that on the 15th. I think that's... Because the relevant events happened on that day. Your Honor, so we think that the prejudicial call happened on March 17th, 9.40 a.m. on March 17th. That's the supplemental excerpt of record, page 12 to 13. That's the one that we believe led to Madrid's arrest on the 17th. So we think any suppression before then would have suppressed that prejudicial evidence. But the government hasn't argued harmlessness here, and I think it's important to point out that under Lustig, because this is a conditional guilty plea, the question is whether any of the erroneously admitted evidence could have reasonably possibly led to the defendant's decision to plead guilty. So it would be very difficult for the government to show harmlessness if it had even argued it in this case. If there's error. Correct, Your Honor. Every question he asked was a good one. I would have asked it if he hadn't. So I've enjoyed this thus far. But as a former district judge, I'm always interested in it when attorneys say they should have recused themselves. So I want to turn to that. Even if it should have at least brought the issue up. Rodriguez, the statement of Rodriguez that you rely upon is clearly dicta. No district court feels that they have to follow dicta of our court. Doesn't that just take you off the tracks of this issue at the very beginning? No, Your Honor. We don't think the statement in Rodriguez is dicta. Oh, okay. Why isn't it? Yes, Your Honor. We think it's an essential premise of the court's holding in Rodriguez. So in Rodriguez, the court explains the different judge needs to sit on a motion to suppress from the judge who issued the original wiretap order. And what's the reason for that rule? The reason for that rule is Rodriguez goes on and is holding to explain that the reviewing judge needs to apply a de novo standard of review to the issuing judge's determination. Right. But here, the reviewing judge in this case at the third law. So are you objecting to him sitting at the original suppression hearing or at the remanded suppression hearing? It was improper in both, but we're challenging the second one. Yeah, and that's what I thought. But as the second one, he was not being called upon to determine whether or not the initial tap was appropriately authorized. He was just being asked to address the issue that we remanded on. When did the officers know or when they should have known that there was a separate conspiracy going on? The purpose of Rodriguez was to keep a judge from reviewing his own rulings. And so to make sure that there was at least an independent view of the wiretaps validity, whether it's dictum or not, we could fight about later. But even if it's a binding holding, it doesn't deal with the judge ruling on an entirely separate issue. The validity of the tap was not in front of him. That's correct, Your Honor. It's a different factual situation from the one presented. It's a different legal situation too, isn't it? Yes, Your Honor. But Rodriguez stated the rule in clear and categorical terms. And I think it made sense to do so because it makes a simple prophylactic rule for district judges to apply. They don't need to know the arguments that are going to be raised in a motion to suppress to know that they cannot sit on a motion to suppress when they issue the wiretap order. That's an easily administrable rule and it makes sense for this court to have done so. In any event, it was stated in categorical terms. And I think if you pull that part of Rodriguez out, the actual holding of Rodriguez collapses. There's no way you can get to the holding if it's permissible for an issuing judge to review his or her own wiretap order. And I'd like to reserve the remainder of my time for questions. Thank you. Coe? May it please the Court, Peter Coe for the United States. The district court found that the intercepted calls were plainly heard. Our position is that's a factual finding that this court reviews for clear error. And in order to be clearly erroneous, the finding would have had to be implausible. The argument that the second component of whether they knew or should have known, that the second component that should have known, is a mixed question of law. In fact, that's a new argument that's being raised by the appellant for the first time. It's not made in any of their briefs. The citation to the Second Circuit case, that's new as well. That's not cited. Assume that they haven't waived it. Tell me why it's wrong. District courts make findings of fact about whether things are reasonable all the time. And it's based on their proximity to the case. It's based on their greater understanding of the record because they've heard more of the evidence. It's also based on their greater expertise in making factual findings. This is not unusual for a district court to have to make a finding about whether something was reasonable as a matter of fact. So we believe the finding still needs to be implausible for the finding to be overturned. And in this case, it wasn't anything remotely close to implausible. Many of their points are geared towards arguing that Agent Melzer should have realized Mr. Escamillo was not using the phone. But Agent Melzer has always acknowledged since 2011 that they realized in very short order that Mr. Escamillo was not using the phone. They kept listening to the phone because they thought that the calls might still be related to the illegal activity that they were investigating. When did Agent Melzer know or should have known that there was a separate conspiracy here? Our position is they had no reason to know until at the very earliest on, after the intercepts had stopped and it was on March 18th or 19th when he met with Agent Kroll and they were able to compare their two investigations and they realized that they didn't have any overlap besides the intercepted calls and the seizures, which to be clear that is a significant overlap. But besides that... You agree that once he met with Agent Kroll, he had reason to know that there was a separate conspiracy being investigated. There's another case being investigated and I would say at that point is the very earliest that you could reasonably say he had reason to know. And that's March 18th or 19th? Yes. But why wouldn't he have noticed that he should start that investigation and look into the database a few days earlier? So as the appellant argues that Agent Melzer should have been alerted by the identity of Madrid to check the database and then to reach out to Agent Kroll like on the 15th. Well, to be clear, when we're referring to the database, I think we're referring to TECS, which is the Treasury Enforcement Communication System. Agent Melzer's access to TECS was to crossing records. He was clear about that. He did not have access to then ICE, now HSI, investigative reports. So all he could have searched himself was crossing records from Mr. Madrid. That would not have revealed an investigation of Mr. Madrid. And Agent Kroll said that as well. He said, only HSI agents have access to our investigative reports. I think we're going to ask the same thing. What led him to then make a connection with Agent Kroll? As Agent Kroll testified, after the arrest of Mr. Madrid on March 17th, he received a call from another HSI agent who had heard about the arrest and said, hey, did you hear about this? And Agent Kroll was the one who then made some calls, found out about the arrest, and he reached out and contacted Agent Melzer. So if Kroll hadn't reached out to Melzer, when should Melzer have realized that he was investigating, that Madrid was involved in a separate conspiracy? It still would be after March 17th. But I'm trying to figure out what a reasonable agent would do and when he would start doing it. Hypothesizing from my perspective? Well, because their position as a reasonable agent would have started investigating the day they learned Madrid's identity to see whether there was a separate conspiracy or another investigation. What's your position? When would a reasonable agent have begun to do that? I think he would have, Agent Melzer, had there not been a contact by Agent Kroll, Agent Melzer would have, after the arrest of both Mr. Madrid and the other individual, Mr. Armendariz, would have begun investigating into their background because of the seizures or because of the arrests. And based on that, I don't know if there would have been additional records checks, whatever. At some point after that, he may have uncovered Agent Kroll's investigation, and then you have essentially the same events. He would reach out to Agent Kroll, they would get together, and they would talk. But that is well after the intercepts had stopped at that point. Could I ask you a question about an entirely different topic here, one we haven't covered yet? Can you address Mr. Carey's request? I think I'll call it a request rather than a motion to change counsel. Yes. And tell me, I'm a little confused about what happened here. Some sort of informal communication came from Mr. Carey to the district judge. Right. And the judge said, that's not properly formatted. Right. And then Mr. Carey's sixth or seventh lawyer said to the judge, let's put everything on hold while you decide this. And the judge said, I'm not putting stuff on hold. They went ahead and the briefing got finished and the judge ruled. I was looking at the record because the other, your opponent said, repeated requests were made to change counsel. Was there ever another request to change counsel after that, what the judge called improperly formatted one? No, there was not a request to change counsel. It came after the improperly formatted one. And to be clear, from the start, the judge has never ruled. That's what I was trying to find out, whether or not the judge ever ruled on it. All the judge said was, this is improperly formatted. Exactly. Okay. And then he had it served on Mr. Carey's attorney, who presumably could make the request correctly. Did the judge have some obligation at that point to explore with Mr. Carey his desire to change counsel? I don't believe so, given the full context of the situation. You had a defense that had a track record in the case of some late tactics to stall things. This was a request that was made within 48 hours or 72 hours of their last brief being due, after the defense had already switched attorneys six or seven times. So Mr. Carey clearly knew how to make the request properly. In that circumstance, I think the district judge could look at it and say, look, I'm not going to help you go out of my way to make this request. If you make the request properly, I'll address it. And I think that's what happened here. He submitted it to the attorney, said, if you need to make this request. I mean, he didn't say it in the court. He didn't say that. I mean, that's what I'm trying to do. Functionally, yes, that's what he's saying, is if you need to make this request, then go ahead and do it. Yeah, the attorney was clearly aware of it. Right, because he filed the status report afterwards. The record is sort of bereft after that of any reference to it. As I read Mr. Carey's brief, it says, despite repeated requests. And that's why I was asking you where the repeated requests were. I couldn't find them. You don't think there were any? No, there was the request for a status hearing in which he said that Mr. Carey has informed me that he's fired me. Right. No, I understand that. But that was it. Thank you. Thank you. So why should we not adopt the prophylactic rule that your friend advances based on Rodriguez and say a district judge should just never review a motion to suppress after they issued the wiretap order? I don't – there might be a circumstance where the judge's finding is being attacked as wrong. And I could see a need for a – or a use for a prophylactic rule in that circumstance. But when there's no allegation that the judge made the mistake, then why? What does it serve? His conduct is not being – he has no stake in the outcome of the proceeding, so there's just no reason for it at that point. So your friend is suggesting that this would be an easily administered rule and would avoid sort of gray areas. So it's just always this rule. If there's a motion to suppress and you issued the wiretap, then you don't review it. I suspect that there's also countervailing reasons for judicial efficiency in economy that would suggest that that rule would not make sense. You represent the government. I mean, what's your view on whether there's any efficiency in the judge reviewing it? Well, I think you're absolutely correct. I think in this circumstance, especially when you have a judge who's handled the case for several years, and then in between the remand from this court and the evidentiary hearing, Rodriguez comes out and says, oh, no, you have to pass this off to another judge, who then has to become entirely familiar with the proceedings. That is not efficient, and it doesn't serve a purpose, especially in this case. If there are no other questions, I'll submit. Thank you, Mr. Cohen. Thank you. And, Mr. Hammer, we only allowed you 35 seconds, but I'll give you two minutes for rebuttal. Thank you, Your Honors. I'd just like to make three brief points. The first on the standard of review issue, this court has held that the issue of the correct standard of review is non-waivable. That's Amato v. Gonzalez, 758 F. 3rd, 1119, footnote 9. We'd be happy to provide the court with a 28-J or supplemental briefing on the standard of review if the court would like. We all understand, I think, that the standard of review is a question of law. The question is, what is the standard of review? Yes, Your Honor, understood. The second point was on the de-confliction database. My friend mentioned that we were discussing Melser's ability to access the Treasury database and ICE reports in the Treasury database. That is not our theory here. Our theory is that with Madrid's identity, Agent Melser could have accessed the de-confliction database called the Law Enforcement Coordination Center in the record. And the only testimony in the record about the access to that database was Agent Kral's testimony at the first volume of the excerpts of record, page 103, in which he testified that he believed all federal agencies used the de-confliction database. But was there any evidence that there was information about Mr. Madrid in the de-confliction database? The only evidence as to that was Mr. Kral's testimony at the first volume of the excerpts of record, page 140 to 141, when he said he put several subjects of his investigation into the database throughout the investigation. But he did say, I don't know whether I put anything about Mr. Madrid in. He was not asked specifically about Mr. Madrid being put into the database. But I think that's where the burden point becomes very important here, Your Honor. It's the government's burden to prove that the plain hearing exception applies. So if there are gaps in the evidentiary record, that falls on the government, not on Mr. Kerry. The third point I'd like to bring up is just to show that these facts were enough to indicate to a reasonable agent that the speakers on the phone were not connected with the Escamilla conspiracy. There were 460 calls wiretapped on T14 between March 10th and March 17th, and not a single one of those calls had any number, name, nickname, or voice that Melzer or his team had ever identified with the Escamilla conspiracy. It's important to note that this was far from the only wiretap that Melzer's team had on the Escamilla conspiracy. They had 40 wiretaps and not a single connection between the two. That led Melzer to the U.S. attorney, asked him if it was appropriate to continue. The U.S. attorney incorrectly told him that it was as long as there were crimes discussed. Your Honors, because the government failed to carry its burden to prove that the plain hearing exception applied, we respectfully request that the court reverse the district court's order denying Mr. Kerry's motion to suppress, vacate the judgment of conviction, and remand so that Mr. Kerry may withdraw his conditional guilty plea. Thank you. Thank you. Counsel, thank you both for your arguments this morning. They were very helpful. The next case for argument...
judges: WALLACE, HURWITZ, BADE